Vincent S. Verdiramo, Esq.
(VSV0830)
Verdiramo & Verdiramo, P.A.
3163 Kennedy Boulevard
Jersey City, New Jersey 07306
(201) 798-7082
(201) 798-4627 - fax
verdiramo@aol.com
Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

-------------------------------------------------------------
STOCKROOM, INC.,

             Plaintiff,

    vs.

DYDACOMP DEVELOPMENT CORP.,
and PLUG & PAY TECHNOLOGIES, INC.,

           Defendants.
-------------------------------------------------------------

Case No.: 2:11-cv-06220

**SECOND AMENDED COMPLAINT**

Plaintiff The Stockroom, Inc. ("Stockroom") complains of Defendants Dydacomp Development Corp. ("Dydacomp") and Plug & Pay Technologies, Inc. ("Plug & Pay") as follows:

### INTRODUCTION

1.    Stockroom is an online retailer. Dydacomp designs and sells software that, among other things, processes credit card transactions (the "M.O.M. System").  Plug & Pay processes credit card transactions in conjunction with the M.O.M. System.  Until recently, Stockroom used Defendants' systems to process its credit card transactions.  In mid-2010, Stockroom discovered by happenstance that the merchant banks were not paying Stockroom some of the proceeds from credit card sales.  After several months of trying to get to the bottom of the problem with Dydacomp and Plug &, Stockroom was finally able to get enough

cooperation to retrieve some of the data necessary to analyze the problem.  Through that audit, Stockroom discovered that it was not paid for about three percent (3%) of its credit card transactions.  To make matters worse, several credit card refunds that Stockroom issued were credited back more than once.  One refund was credited to the customer *nineteen times*.  All told, Stockroom has lost at least several hundred thousand dollars.  Neither Dydacomp nor Plug & Pay have acknowledged responsibility; each points a finger at the other.  But at least one is responsible, and Stockroom must be compensated for these defective products and services.

## PARTIES, JURISDICTION AND VENUE

2.      Stockroom is a California Corporation with its principal place of business located in Los Angeles, California.

3.      Dydacomp is a Delaware Corporation that is registered to do business in New Jersey. Dydacomp's website, www.dydacomp.com, lists its place of business in the United States as 11-D Commerce Way, Totowa, NJ 07512.

4.      Plug & Pay is a Delaware corporation that is registered to do business in New York.  Plug & Pay's website, http://www.plugnpay.com, lists its place of business as 1363-26 Veterans Highway Hauppauge, NY 11788.  Plug & Pay's website states that its name is "Plug'n Pay Technologies, Inc." but its registered name is Plug & Pay Technologies, Inc.

5.      The original jurisdiction of this Court is founded upon 28 U.S.C. § 1332(a) in that the parties are citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

6.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391(a)(1) in that Defendant Dydacomp resides and transacts business within this jurisdictional district and that the Defendant Plug & Pay Technologies reside and/or transacts business within this jurisdictional district and further Plaintiff transacts business within this jurisdictional district.

## BACKGROUND FACTS

### A.     The M.O.M. System

7.     Stockroom owns and operates several websites and physical retail stores that sell sex toys, bondage gear, and latex and leather clothing. Stockroom's websites include www.stockroom.com; www.stormyleather.com; www.syren.com; and www.kinklab.com.

8.     Dydacomp sells an order processing system for online merchants. Dydacomp's website describes the product as follows:

> Dydacomp's Multichannel Order Manager (M.O.M.) solution, formerly Mail Order
> Manager, is the leading integrated Ecommerce and PCI compliant order
> management software available for multi-channel businesses. Nearly 10,000
> eCommerce, catalog fulfillment, and multichannel commerce merchants
> worldwide rely on Dydacomp order processing systems everyday for
> ecommerce hosting and checkout, inventory management, shipping solutions,
> order tracking, and much more.

9.     In or about 1999, Stockroom purchased and started using the MOM system to process retail transactions originated through its physical and online stores. A copy of the terms of the licensing agreement included with the MOM program is attached hereto as Exhibit A.  Thereafter, Dydacomp required Stockroom to purchase and install several upgrades to M.O.M., including the following:

a. Original installation version

b. Upgrade build 600, installed in or about the first quarter of 2008

c. Upgrade build 600 – 5.4-6.0

d. Upgrade build 700, installed in or about June 2010

e. Upgrade build 700 SQL

f. Upgrade build 700 5.4-6.0

g.  Upgrade build 700 6.0-7i

With each upgrade, Stockroom agreed to a new license agreement.  Copies of the terms of the agreements included in the upgrades are attached hereto as Exhibits B – G.  Stockroom made sure that each installation and upgrade were installed into Stockroom's computer system installed it onto Stockroom's system according to Dydacomp's instructions and ensured Stockroom was properly using the software according to Dydacomp's instructions.

10.    When Stockroom initially started using MOM, credit card transactions were processed through a company called CyberSource, a Visa Company, which used the trademark Authorize.net for its credit card processing product.

11.    In or about 2004, Stockroom was notified that Authorize.net (CyberSource) would no longer provide services to adult companies.  Stockroom had very little time to switch processors.

12.    Dydacomp required Stockroom to use Plug & Pay to process transactions.  Unfortunately, Plug & Pay had a much higher cost per transaction than comparable competing companies.  However, Stockroom calculated that it would cost $10,000 and several hundred employee hours to switch to a different inventory and processing software and thus begrudgingly agreed to use Plug & Pay.  Because Authorize.Net was insisting on a switch, the transition from Authorize.Net to Plug & Pay was very quick.  Attached hereto as Exhibit I is a copy of Stockroom's contract with Plug & Pay, which is incorporated herein by reference.

13.    In 2006, the Payment Card Industry Data Security Standard ("PCI") was launched.  This is a set of requirements designed to ensure that all companies that process, store or transmit credit card information maintain a secure environment.

14.    Dydacomp changed its software to continue to be or become PCI compliant.  Dydacomp has since required Stockroom to spend thousands of dollars to

purchase PCI compliant upgrades.  When Stockroom balked at paying for the upgrades, Dydacomp threatened to stop processing Stockroom's transactions if it did not purchase a new PCI compliant upgrade.  Stockroom thus spent several thousand dollars on upgrades that Dydacomp required, supposedly to ensure that Stockroom's credit card processing was PCI compliant.

15.  Payment card (i.e., credit or debit card) transactions consist of two primary functions: authorization and settlement. Authorization occurs at the time of the transaction, such as swiping a card or confirming an online order. The merchant accepts the payment information from the cardholder and passes it to the payment processor, who confirms the validity of the card, the availability of credit for the purchase, etc. and returns a message indicating that the transaction was approved or denied.  With an approval comes an authorization code, a unique numeric or alphanumeric identifier for the transaction that demonstrates that the payment processor, in this case defendant Dydacomp, received approval for the transaction from the cardholder's issuing financial institution, and that the funds have been set aside and the cardholder's available balance has been reduced by the amount of the charge.  This code, is in essence a statement of fact which is relied upon by the merchant and acts as a means to identify the individual transaction and establish its legitimacy.

16.  After authorization comes the settlement process, where the merchant, payment processor or acquirer, cardholder and card issuer reconcile financially for the purchase. This may occur at the time of transaction or may occur at another point in time (e.g., batch settlement at the end of the business day).  Once a merchant receives an authorization code, the merchant can then rely on that code as an assurance of the validity of the transaction and proceed with the sale.  Merchants all over the world use

this process for numerous transactions, whether for brick-and-mortar or e-commerce sales.

17.   Organizations that store, process, or transmit cardholder data must adhere to the PCI DSS requirements for securing cardholder data from unauthorized disclosure or misuse. Many of these organizations make use of payment applications developed by third parties, and these third parties submit their application software for a third-party review against the PA-DSS (available from www.pcisecuritystandards.org). The PA-DSS requirements mandate proper security for payment card data including data encryption, strong passwords, and software development procedures that include information security throughout the software development life cycle. Specifically, these software development requirements call for proper testing and quality assurance for software before release to customers. These requirements also expressly call for removal of test data, user accounts, or other testing configurations before release.

**B.**   **The M.O.M. System's Failure – Stockroom Fails To Receive Payment For Several Thousand Approved Credit Card Transactions For Several Years**

18.   In mid-2010, Stockroom closed its Stormy Leather retail store in San Francisco. Stockroom also closed the store's bank accounts.

19.   When Stockroom's CFO, Craig Hall, reconciled the transactions for the retail store, he discovered that several thousand dollars in credit card transaction revenue never made it into the store's bank account.  Simply put, the merchant banks did not pay Stockroom for dozens of credit card transactions each month.  Each of the transactions had a supposedly valid authorization code.

20.   Stockroom's CFO, Craig Hall, spent approximately 80 hours auditing its financial records, plus additional time obtaining data from Dydacomp and Plug'N'Pay in

order to get the information necessary to determine that each month a small

percentage of online purchases never were credited to Stockroom's merchant bank

accounts.  Stockroom's President, Mike Herman, also spent dozens of hours dealing

with the audit issues, and other employees and independent contractors spent a lot of

time on the audit as well.

21.    The audit revealed that sometimes the problematic transactions consisted

of as few as 2 out of every 1,000 transactions; sometimes as many as 80 out of 1,000

transactions.  Overall, 3.2% of transactions were affected.  Such small percentages

add up over time, but would have been impossible through the exercise of ordinary due

diligence for plaintiff to have caught in an audit for any specific period because of the

manner in which the merchant banks deposit the sale proceeds.  Each merchant bank

processes orders at different times – some daily, some weekly, etc.  Each company

also removes its fees at different times – some daily, some weekly and some monthly.

With chargebacks and refunds, it can take even longer to close out a particular month.

Thus, sales can never be pinpointed as of a particular day to determine whether all of

the transactions that were approved actually were credited to Stockroom's account.

Because the percentage of failed transactions is so random and so low, it could easily

be attributable to the different deposit and fee withdrawal schedules, chargebacks and

refunds, rather than a failed transaction.

22.    Retailers throughout the world rely on the understanding that receipt of an

authorization code means that the funds will be deposited to the retailer's merchant

bank account.  Retailers routinely rely on receipt of an authorization code to send out

product or perform services. Plaintiff therefore reasonably relied on the authorization

codes generated by Dydacomp in this case as validation of the subject transactions.

There is no generally accepted or routine accounting practice whereby audits are

conducted to ensure that credit card authorization codes are valid and that funds are accurately debited or credited based on receipt of an authorization code. Such audits would take a substantial amount of time and would be fruitless because of the varied schedule of deposits, fees and chargebacks. The only way to get an accurate reading would be to change bank accounts each time an audit is performed. The audit would take a substantial amount of time, and changing bank accounts would as well. Few if any companies routinely do this to determine or confirm whether authorization codes are valid and such extraordinary actions are outside the scope of ordinary due diligence.

23.     Stockroom's experienced CFO has never heard of dummy authorization codes being issued. Indeed, Internet commerce would be substantially impaired and possibly even halted if retailers felt they could not rely on authorization codes. The burden on commerce would be overwhelming, and would increase the cost of doing business – and the price of products and services – to a significant degree.

24.     Companies that sell payment processing software have no reason to expect their customers to audit their records to confirm that authorization codes are accurate and that payments and refunds are properly processed. Such companies have an understanding and expectation that their customers will rely in authorization codes without question. Retailers are never expected to, nor can they, catch software programming or testing errors.

25.     Software developed for payment card transactions, to be fit for the ordinary purposes for which such software is used, must incorporate proper security and software development practice to protect cardholders and merchants. Proper software development practice rigorously tests software for correct functionality and removes testing functions, data, or configuration elements from the software it releases

to customers. The PA-DSS requirements call for software development practices that properly test software before release of the software for purchase. Stockroom is informed and believes and based thereon alleges these invalid codes resulted from faulty programming practices or test functions left in the release.

26. Based on the facts recited herein and incorporated by reference, Stockroom is informed and believes that one or more agents of Dydacomp were aware of the faulty programming and/or test functions and concealed the problem, even with updates and new versions of the program. However, the complete details of how these faulty programming and/or test functions occurred and the extent of Dydacomp's awareness thereof is information exclusively in the possession and under the control of the defendants, the full disclosure of which will require discovery to be afforded plaintiff.

27. Ultimately, discovering a software error that yields results such as Stockroom's (i.e., intermittent and rare occurrences of invalid authorization codes) would prove an extraordinary and costly challenge to a merchant making use of this kind of payment software. Merchants, as a matter of industry practice, do not employ any sort of redundant check on the validity of authorization codes, but instead, as did Stockroom, reasonably regard a valid authorization code with an approval status as sufficient for the purposes of completing the sale.

## C.   Dydacomp And Plug & Pay Were Not Very Helpful

28. Upon discovering the discrepancies, Stockroom notified both Plug & Pay and Dydacomp of the problem. Messrs Hall and Herman both began working on finding out what was causing the problem and how to immediately solve it. They enlisted help from Dydacomp and Plug & Pay.

29. Dydacomp was not very helpful, dragged its feet and ultimately denied responsibility. Plug & Pay was a bit more helpful, but it still took Stockroom months to

get information and help.  Ultimately and predictably, Plug & Pay claimed that

Dydacomp was at fault.

30.    Although it took several months to get the information necessary to

perform a limited audit, Stockroom was finally able to determine that there were

several recurring problems with the system.

1. Each month, Stockroom was not paid thousands of dollars for

transactions for which authorization codes were issued.

2. Each month, when Stockroom processed credit card refunds,

some of the refunds were given multiple times for the same

transaction.  For example, one customer was issued 19 identical

refunds.

31.    Stockroom determined that it was not at fault for any of the processing failures.

Plug & Play informed Stockroom that it appeared that Dydacomp was issuing the

authorization codes improperly.  According to Plug & Pay, when a transaction is entered

through the M.O.M. system, the M.O.M. software is supposed to contact Plug & Pay's system

to get an authorization code approving or denying the transaction.  M.O.M. is supposed to get

the authorization code from Plug & Pay, which receives the code from the merchant bank.

The authorization is never supposed to originate with Dydacomp or M.O.M. under any

circumstance, ever.   In all cases, the authorization code must come from the financial

institution that is ultimately responsible for approving the transaction.  Plug & Pay informed

Stockroom that for the faulty transactions it reviewed, there was absolutely no communication

between the M.O.M. software and Plug & Pay.  Plug & Pay suggested that based on the lack

of communication, the M.O.M. software never initiated the communication and just issued the

authorization codes itself, without asking for or, by extension, waiting for a code to come back

from the merchant bank through Plug & Pay.  Additionally, several of the authorization codes

were identical.  The odds of having repeated instances of identical authorization codes are prohibitively low. Furthermore, the odds that such extraordinary results could have happened randomly without knowledge on Dydacomp's part are even lower.  Although Dydacomp denied that M.O.M. was the source of the problem, in fact it is impossible for the M.O.M. software to issue an authorization code without being programmed to do so.  The M.O.M. software is never supposed to issue an authorization code and indeed should not have the ability to do so.  Each authorization code was thus a misrepresentation regarding the status of the transaction.

32.    Stockroom is informed and believes, and based thereon alleges, that one or more agents of Dydacomp knew of the problems with M.O.M.'s issuance of dummy authorization codes without communication with the gateway.  Rather than fix the problem with the original software sold to Stockroom, or thereafter in upgrades or new software concealed the problem with the software  from Stockroom. Under the circumstances, it is not possible for a programmer or software developer to have been unaware of the problem. Somebody intentionally created the software code that caused the M.O.M. software to independently generate the authorization codes and return those illegitimate codes back to Stockroom.  The entire transaction approval process requires complex and intentional software coding.  It does not happen by accident or glitch in the software.

33.    Stockroom is informed and believes and based thereon alleges that Dydacomp had an obligation but failed to monitor processed transactions to ensure that all were going through.  Dydacomp had the means to do this; Stockroom could not reasonably have monitored the transactions in a cost-efficient manner and was not reasonably required to do so under the circumstances.  Clearly, there is a problem somewhere with the processing system, and Stockroom is not causing the problem.  But Stockroom lost hundreds of thousands of dollars because of the problem.  Stockroom estimates that the losses totaled

about $60,000 per year since Stockroom installed the M.O.M. system.

**D.   Stockroom Could Not Have Reasonably Discovered The Problem Earlier**

34. Using reasonable diligence, Stockroom could not have reasonably discovered the problem earlier than June 2010.  The problem was discovered only because Stockroom closed the bank account for the Stormy Leather retail store in San Francisco.  Otherwise, it is impossible to track and compare revenue to actual gross sales because the merchant banks deposit the charged funds at different times. Sometimes it is the same day; sometimes the next day, and sometimes it is a few days later.  Visa and Mastercard charge their fees once a month; American Express, every day.  Thus, all such calculations would always be at least a few thousand dollars off. Moreover, Stockroom did not feel the need to audit to ensure full payment on the credit card transactions because authorization codes were issued, and Stockroom had no reason to doubt that it would get paid on those approved transactions.

35.     But with the closing of the store, there was an end date – when no more transactions were processed through the store's bank account, which was closed.  At that point, revenue could be compared to gross sales, and the discrepancy was discovered.

36.     Stockroom then spent several months trying to get Dydacomp and Plug & Pay to explain the problem and help Stockroom retrieve data so that a more in-depth audit could be conducted.  Neither company seemed to know their systems very well, and gave Stockroom incomplete or inaccurate information about how to retrieve information for an internal audit.  They were also slow to respond.

37.     Because Dydacomp and Plug & Pay were so difficult to deal with, and because there was no way of knowing whether the problem was solved, Stockroom spent thousands of dollars creating and implementing a new inventory and sale

transaction system.

38.     Along with working on implementing a new system, Stockroom finally conducted an extensive audit with the information it was able to obtain from Dydacomp and Plug & Play.  This took hundreds of man hours to cull data necessary for the audit.

39.     From this audit information, Stockroom estimates that three percent (3%) of its annual credit card transactions were not paid.  Not only did Stockroom lose the sale proceeds, but Stockroom also lost the sales taxes that it paid on each transaction.

## FIRST COUNT

### (Breach of Written Contract)

### (Against Dydacomp)

40.     Plaintiff repeats and re-alleges paragraphs 1-39 above, as though set forth in full herein.

41.     The terms of Plaintiff's written agreements with Dydacomp are attached hereto as Exhibits A to G.

42.     Stockroom entered into the agreements because it wanted to use the M.O.M. System to track inventory and process purchase transactions.

43.     Stockroom has performed all of its obligations under its contracts with Dydacomp.  Dydacomp breached the agreements by failing to ensure that its software program worked properly and by failing to ensure that all credit card payments were properly processed to ensure that Stockroom would receive the funds after an authorization code was issued for each transaction.  Dydacomp also breached the contract by failing to ensure that refunds were only credited one time, and not multiple times.

44.     As a result of Dydacomp's breaches, Stockroom has lost in excess of several hundred thousand dollars.

**WHEREFORE**, Plaintiff demands judgment against Dydacomp for the following relief:

      (a) compensatory damages

      (b) consequential and incidental damages;

      (c) interest;

      (d) attorney's fees and costs of suit; and,

      (e) such other and further relief as the Court deems equitable and just.

## SECOND COUNT

### (Breach of Written Contract)

### (Against Plug & Pay)

45.    Plaintiff repeats and re-alleges paragraphs 1-44 above, as though set forth in full herein.

46.    The terms of Plaintiff's written agreements with Plug & Pay are attached hereto as Exhibit H.

47.    Dydacomp compelled Stockroom to enter into its agreement agreement with Plug & Pay to process online credit card purchases.

48.    Stockroom has performed all of its obligations under its contract with Plug & Pay.

49.    Plug & Pay breached the agreement by failing to ensure that all credit card payments were properly processed to ensure that Stockroom would receive the funds after an authorization code was issued for each transaction.  Plug & Pay also breached the contract by failing to ensure that refunds were only credited one time, and not multiple times.

50.    As a result of Plug & Pay's breaches, Stockroom has lost in excess of several hundred thousand dollars.

**WHEREFORE**, Plaintiff demands judgment against Plug & Pay for the following relief:

(a) compensatory damages

(b) consequential and incidental damages;

(c) interest;

(d) attorney's fees and costs of suit; and,

(e) such other and further relief as the Court deems equitable and just.

## THIRD COUNT

### (Breach of the Covenant of Good Faith and Fair Dealing)

(Against Dydacomp and Plug & Pay)

51.     Plaintiff repeats and reiterates each and every allegation contained in paragraphs 1 50 herein as if set forth herein verbatim and at length.

52.     There is implied in every contract a covenant of good faith and fair dealing requiring Defendants to deal with Plaintiff with the utmost good faith and to deal fairly with Plaintiff in the implementation of the contract terms and with respect to the parties' contractual relationship.

53.     For the reasons aforesaid, Defendants have breached such covenant to Plaintiff's detriment, resulting in damages to Plaintiff.

**WHEREFORE,** Plaintiff demands judgment against the Defendants, jointly and severally, for the following relief:

(a)     compensatory damage;

(b)     consequential and incidental damages;

(c)     punitive damages;

(d)     interest;

(e)     costs of suit, including reasonable attorney's fees; and,

(f)     for such other and further relief as the Court deems equitable and just.

## FOURTH COUNT

(Violation Of The New Jersey Consumer Fraud Act)

(Against Defendants)

54.     Plaintiff repeats and re-alleges paragraphs 1-53above, as though set forth in full herein.

55.      Plaintiff is a "person" as defined by N.J.S.A. 56:8-1(d).  Defendants are "persons" as defined by N.J.S.A. 56:8-1(d). The goods and/or services is/are merchandise as defined by N.J.S.A. 56:8-1(c).

56.     The sale of the goods and/or to plaintiffs by defendant was a "sale" as defined by N.J.S.A. 56:8-1(e).

57.     Accordingly, under the facts alleged in this complaint, plaintiffs are consumers entitled to the protection and remedies provided for by N.J.S.A. 56:8-1, *et seq*.

58.     Defendants and/or defendants' agents and/or brokers and/or independent contractors and/or salespeople and/or employees and/or representatives and/or servants and/or workmen engaged in an unconscionable commercial practice, deception, fraud, false pretense, false promise or misrepresentation against plaintiffs. Specifically, on information and belief, defendants knowingly concealed, suppressed or omitted the material fact that its payment processing software had serious defects and was not functioning properly with the result that hundreds of thousands of dollars in income would be lost from Stockroom with intent that Stockroom rely upon same.  Furthermore on information and belief defendants knowingly caused t o have issued false authorization codes with the intention that Stockroom would rely thereon. Stockroom did reasonably rely on these codes to its detriment and lost hundreds of thousands of dollars as a result.

59.     Alternatively, Defendants acted recklessly in failing to confirm that their product would work as promised, especially in light of their intended use to process business

transactions thereby affecting a user's business viability.

60.    The aforesaid misrepresentations were material to the transaction(s) at issue. They also had the effect of concealing from plaintiff the existence of claims and causes of action had by plaintiff against the defendants. which plaintiff could not have reasonably discovered through due diligence before Stockroom actually discovered them as detailed above.

61.    As a result of defendants' aforesaid misconduct, Stockroom sustained an ascertainable loss capable of being calculated with a reasonable degree of certainty.

62.    In light of the aforesaid, defendants and/or their employees and/or servants and/or agents violated N.J.S.A. 56:8-1, et seq.

63.    Defendants' conduct may have also constituted violations of applicable provisions of New Jersey Statutes, the New Jersey Administrative Code, the federal statutes pled herein and/or the Code of Federal Regulations..The complete factual details of the mechanisms whereby defendants', or either of their, software systems failed and that failure was concealed from plaintiff constitutes information at this time exclusively in defendants' possession and under their control and must await disclosure through the discovery process.

64.    Stockroom brings this action pursuant to N.J.S.A. 56:8-19 and in accordance therewith, seek statutory treble damages, attorney's fees and court costs.

**WHEREFORE**, Stockroom demands judgment against defendants, for the following relief:

(a)    Actual and consequential damages in the amount of the total contract price, and/or all monies paid to date thereon;

(b)    Consequential damages in the amount of lost income proximately caused by the failure of the goods sold to function properly;

(c)    Expenses incurred by Stockroom relative to closing costs and the cost to

remedy the software system;

(d)     The remedies provided for under any state and/or federal statutes pled herein, statutory treble damages, the equitable remedies provided for under the New Jersey Consumer Fraud Act and/or under the common law relative to defrauded persons and/or pursuant to N.J.S.A. 2A:32-1, et seq.;

(e)     Any other applicable consequential, incidental, nominal and exceptional damages; and

(f)     Lawful interest, court costs, attorney's fees and such other and further relief as the court shall deem equitable and just.

### FIFTH COUNT

(Breach Of Express Warranty)

(Against Defendants)

65.     Plaintiff repeats and re-alleges paragraphs 1-64 above, as though set forth in full herein.

66.     At the time of the sale and as a part of that sale, defendants, in order to induce Stockroom to agree to purchase the goods, warranted and represented to Stockroom that the goods would cause Stockroom's sale and credit transactions to be properly processed.

67.     Stockroom purchased the goods in reliance on defendants' warranty and representations.

68.     The goods were not of the character stated by defendants, but on the contrary were not adequate to perform the functions as promised, and therefore defendants' warranties were false and untrue.

69.     As soon as Stockroom had knowledge of a problem, and that defendants' warranties and representations were false, Stockroom gave notice of the false warranty and representation to Defendants and asked them for help in determining the exact cause of the

problem and how to fix it.

70.     Stockroom has suffered damages due to lost sales revenues and multiple instances of duplicated credits on customer returns.

71.     By reason of the above, Stockroom has suffered substantial damages.

**WHEREFORE**, Stockroom demands judgment against defendants, for the following relief:

(a)     Compensatory and/or consequential damages arising from the breach of warranty;

(b)     Pre-judgment Interest according to law;

(c)     costs of suit, reasonable attorneys' fees; and

(d)     such further relief that the Court considers equitable, just and proper.

### SIXTH COUNT

(Breach Of Implied Warranty Of Merchantability)

(Against Defendants)

72.     Plaintiff repeats and re-alleges paragraphs 1-71 above, as though set forth in full herein.

73.     At all times mentioned, defendants were in the business of selling the above-mentioned software and services for use in processing retail transactions.

74.     Defendants sold and delivered these products and services to Stockroom, for which Stockroom paid the defendants' set prices.

75.     The contracts between Stockroom and the defendants contained an implied warranty that the products would be of merchantable quality. The products were not of merchantable quality, however, in that they failed to ensure that Stockroom's sale and credit transactions would be properly processed.  Multiple sale transactions were not processed properly and multiple credits were credited several times instead of only once.  The products

could not pass without objection in Stockroom's trade; was not of average quality in Stockroom's trade and not fit for the ordinary use to process financial sales and credits.

76.    Within a reasonable time after receiving the goods, Stockroom discovered the breach of warranty and immediately gave written notice to defendants of the breach and sought help to remedy the situation.

77.    Stockroom attempted to use the defendants' products in the manner and for the purpose for which they were intended, resulting in the following damage to Stockroom proximately caused by the breach of warranty:  Multiple sale transactions were not properly processed and Stockroom never received the funds from those sales and multiple credits from customer returns were processed and credited more than one time.  Stockroom was damaged in the sum of in excess of $1 Million.

**WHEREFORE**, Stockroom demands judgment against defendants, jointly and severally, for the following relief:

(a)    Compensatory and/or consequential damages arising from the breach of warranty;

(b)    Pre-judgment Interest according to law;

(c)    costs of suit, reasonable attorneys' fees; and

(d)    such further relief that the Court considers equitable, just and proper.

### SEVENTH COUNT

(Breach Of Warranty of Fitness for a Particular Purpose)

(Against Defendants)

78.    Plaintiff repeats and re-alleges paragraphs 1-77 above, as though set forth in full herein.

79.    Stockroom purchased the above-mentioned goods from the defendants for the purpose of processing its retail sales transactions and credits.

80.     Defendants knew the purpose for which Stockroom purchased the goods, and, at the time of sale, impliedly warranted the goods to be, in all respects, fit and proper for that purpose.

81.     Stockroom relied on defendants' warranties and attempted to use the goods for that purpose, but the goods were defective in that they did not correctly process the transactions and in excess of $1 Million in sales revenues were not processed and multiple customer credits were credited more than one time.  The goods therefore were unsuited for use in Stockroom's business.

82.     As soon as the nature of the goods was ascertained, Stockroom notified.

83.     By reason of the above, Stockroom has been damaged in the sum of in excess of $1 Million.

**WHEREFORE**, Stockroom demands judgment against defendants, jointly and severally, for the following relief:

(a)     Compensatory and/or consequential damages arising from the breach of fiduciary duty;

(b)     Pre-judgment Interest according to law;

(c)     costs of suit, reasonable attorneys' fees; and

(d)     such further relief that the Court considers equitable, just and proper.

### EIGHTH COUNT

(Breach Of Fiduciary Duty)

(Against Defendants)

84.     Plaintiff repeats and re-alleges paragraphs 1-83 above, as though set forth in full herein.

85.     Under the circumstances of this case plaintiff  was compelled to repose a special trust and confidence in the defendants with respect to the transactions in issue.

Among those circumstances was the in-depth and detailed knowledge of the manner in which its software was designed, programmed, functioned and malfunctioned held exclusively by the defendants and not available to plaintiff notwithstanding the exercise of ordinary and reasonable care and diligence.

86.    Defendants purported to have special expertise and skill in the design and functioning of payment processing software and based on such purported special expertise and skill caused plaintiff to rely on defendants' superior knowledge and expertise to assure itself that its transactions would be accurately and securely effected.

87.    At no time was it economically or technically feasible for plaintiff to have monitored the accuracy or security of each of its thousands of transactions and the operation of the subject software and plaintiff reasonably relied on defendants to fulfill those functions which they were capable of doing with much less expense and difficulty, thereby entrusting the safety and security of its  collection accounts to defendants.

88.    The failure of defendants to properly monitor the operation of their systems and to notify plaintiff of the generation of  what plaintiff, on information and belief, contends were false authorization codes  and the consequences thereof constituted a breach of fiduciary obligation and relationship on defendants' part.

**WHEREFORE**, Stockroom demands judgment against defendants, jointly and severally, for the following relief:

(a)    Compensatory and/or consequential damages arising from the breach of warranty;

(b)    Pre-judgment Interest according to law;

(c)    Costs of suit, reasonable attorneys' fees; and

(d)    Such further relief that the Court considers equitable, just and proper.

## NINTH COUNT

(Fraud)

(Against Defendants)

89.     Plaintiff repeats and re-alleges paragraphs 1-88 above, as though set forth in full herein.

90.     On information and belief, as set forth above, defendants caused to be issued false authorization codes. These codes conveyed factually false information; to whit, that the transactions  with respect to which they were issued were valid and regular and would result in plaintiff Stockroom being credited with payment for goods sold. The complete detail and facts as to exactly how this was effected by defendants relies on records exclusively in the possession of and under the control of the defendants.

91.     On further information and belief defendants and/or their servants, agents and employees knew that improper and untruthful codes were being issued.

92.     Defendants knowingly intended plaintiff to rely on the  authorization codes, as that was the purpose for which such codes existed.

93.     Plaintiff reasonably relied on the authorization codes to its detriment in that it shipped goods for which it was not paid.

94.     Plaintiff was not aware, nor could it have become aware through reasonable effort,of the falsity of the authorization codes until 2010, as detailed above.

95.     Defendants, by virtue of the foregoing conduct, are liable to plaintiff for the tort of fraud or deceit.

96.     Defendants, in addition to having committed fraud by the knowing issuance of false information are further liable therefor by virtue of having failed and refused to inform plaintiff of the defects in their system including, specifically, the issuance of false authorization codes and the failure of its system to properly effect payment. Such information was material

to plaintiff's decision to continue to do business with defendants and plaintiff would, assuredly, not have continued to entrust its transactions to defendants' software, had it known of such information. Defendants had a duty to inform plaintiff thereof by virtue of their fiduciary obligation, as set forth in the preceding count.

WHEREFORE, Stockroom demands judgment against defendants for the following relief:

      (a) Compensatory and/or consequential damages for defendants' fraud and deceit;

      (b) Punitive or exemplary damages;

      (c)  Costs of suit, reasonable attorneys' fees;

      (d)      Pre-judgment interest according to law; and

      (e) Such other relief that the Court considers equitable, just and proper.

## JURY DEMAND

Plaintiff demands trial by a jury on all of the triable issues of this complaint.

## DEMAND FOR DISCOVERY OF INSURANCE COVERAGE

Pursuant to Rule 4:10-2(b), demand is made that Defendants disclose to Plaintiff's attorney whether or not there are any insurance agreements or policies under which any person or firm carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in this action or indemnify or reimburse for payments made to satisfy the judgment and provide Plaintiff's attorney with true copies of those insurance agreements or policies, including, but not limited to, any and all declaration sheets. This demand shall include and cover not only primary coverage,

but also any and all excess, catastrophe and umbrella policies.

Dated: October 1, 2012

_____
Vincent S. Verdiramo, Esq. (VSV0830)
Verdiramo & Verdiramo, P.A.
3163 Kennedy Boulevard
Jersey City, New Jersey 07306
201-798-7082, 201-798-4627 (fax)
verdiramo@aol.com